**UNITED STATES of America, Plaintiff,**

v.

**John P. HALL, Defendant.**

Civ. No. 88–1155.

United States District Court,
M.D. Pennsylvania.

Jan. 5, 1990.

---

Gordon Alan Daniel Zubrod, Asst. U.S. Atty., Harrisburg, Pa., for plaintiff.

John Havas, Foulkrod, Reynolds & Havas, Harrisburg, Pa., for defendant.

## MEMORANDUM

NEALON, District Judge.

Currently before the court are the cross-motions of the parties for summary judgment. *See* documents 9 and 10 of record. For the reasons that follow, the court will deny the summary judgment motion of the plaintiff and will grant summary judgment in favor of the defendant.

### I. Background

#### A. *Factual History*

On or about November 9, 1984, the defendant John P. Hall (Hall) was indicted by a federal grand jury sitting in Harrisburg, Pennsylvania, and charged with, *inter alia,* knowingly and willfully transporting bearer negotiable instruments in the amount of $1,035,000 from Camp Hill, Pennsylvania to Nassau, Bahamas in violation of 31 U.S.C. §§ 5316(b) and 5322(b) (requiring the filing of a Currency and Monetary Instrument Report). *See* document 18 of record, exhibit C. The period involved in the five (5) count indictment was from October 17 to October 31, 1984. During the month of November, 1984, the United States (the Government) and Hall's counsel engaged in plea negotiations. *See* documents 27 and 33 of record at ¶ 6.

On December 3, 1984 Hall entered a plea of guilty before this court to Counts I, II, and V of the indictment which charged him with violations of 18 U.S.C. § 2314 (Count I), 18 U.S.C. § 1343 (Count II), and 31 U.S.C. § 5316(b) (Count V). *See* document 27 at ¶ 29. The plea was entered pursuant to a plea agreement signed by Hall, his counsel, and David Dart Queen (Queen), who was, at that time, the United States Attorney for the Middle District of Pennsylvania. *See id.; See also* document 18 of of record, exhibit I.

Hall was sentenced by this court on March 13, 1985 to a one (1) year term of imprisonment, two (2) years special probation and a $10,000 fine. *See* document 18, exhibit J. In addition, the court directed Hall to perform two hundred (200) hours of community service work and to successfully complete a mental health program as directed by the United States Probation Office. *See id.* By Order dated July 24, 1985, the court, pursuant to Hall's motion for reduction of sentence under Rule 35 of the Federal Rules of Criminal Procedure, reduced Hall's period of incarceration by approximately two weeks and increased his community service requirement to four hundred (400) hours. *See id.,* exhibit K.

On July 15, 1986, Hall was informed by letter from Queen, who was, by that time, a Deputy Assistant Secretary in the Department of the Treasury and no longer United States Attorney in this district, that Queen, in his new capacity, had assessed a civil penalty against Hall in the amount of $1,035,000 pursuant to 31 U.S.C. § 5321(a)(2). *See id.,* exhibit L. By letter dated August 12, 1986, Hall's counsel registered Hall's objections to this assessment. *See id.,* exhibit N. In his response of October 14, 1986, Queen stated that after consideration of each of Hall's arguments [w]e ... have concluded that the original civil penalty, while substantial, is appropriate." *Id.* exhibit O.

#### B. *Procedural History*

On July 29, 1988, the Government instituted this action seeking to collect the civil penalty which had been assessed against Hall. *See* document 1 of record. Hall filed an answer to the Government's complaint on November 4, 1988. *See* document 6 of record.

The Government's motion for summary judgment, a statement of undisputed material facts, as well as supporting memorandum and other documentation were filed on April 18, 1989. *See* documents 9, 10, and 11 of record. Hall responded to the Government's motion on July 3, 1989 by

filing a memorandum of law in opposition to the motion and a response to the Government's statement of undisputed facts. *See* documents 14 and 15 of record. Additionally, Hall filed his own motion for summary judgment, along with a supporting memorandum and documentation. *See* documents 16–19 of record.

The Government noted its opposition to Hall's motion for summary judgment by a brief filed on August 29, 1989. *See* document 24 of record. Hall subsequently filed a reply brief and his statement of undisputed facts. *See* documents 26 and 27 of record. The Government filed a response to Hall's statement of undisputed facts on October 18, 1989. *See* document 33 of record.

With the receipt of the Government's response to Hall's statement of undisputed facts, all the documents necessary for the court's consideration of these motions have been filed. Thus, the motions are now ripe for disposition by the court.

## II. Discussion

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). When examining a motion for summary judgment, the court must view all facts in the light most favorable to the party opposing the motion. *Betz Laboratories, Inc. v. Hines*, 647 F.2d 402, 404 (3d Cir.1981). If there exists a genuine issue as to any material fact, summary judgment must be denied. Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citing 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 2725, at pp. 93–95 (1983)). In addition, summary judgment will not lie if the dispute about a material fact is "genuine," that is, "if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party." Id.

In cases such as the present one, where cross-motions for summary judgment have been filed, each side essentially contends that no issue of material fact exists from its particular point of view. The court should, therefore, consider each motion for summary judgment separately. *Home for Crippled Children v. Prudential Insurance Co.*, 590 F.Supp. 1490, 1495 (W.D.Pa.1984). Since each side is moving for summary judgment, each side bears the burden of establishing a lack of genuine issues of material fact. *See id.* Such inherently contradictory claims do "not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives ... determination [of] whether genuine issues of material fact exist." *Rains v. Cascade Industries, Inc.*, 402 F.2d 241, 245 (3d Cir.1968); *See also* 10A C. Wright and A. Miller, and M. Kane, *Federal Practice and Procedure* § 2720 at p. 16–19 (1983). Moreover, the standards under which a court grants or denies summary judgment do not change by virtue of cross-motions being presented. *Home for Crippled Children*, 590 F.Supp. at 1495.

With these principles in mind, the court will embark on its discussion of the present motions. Because the motions essentially argue opposite sides of the same issues, however, separate examination of each motion would only lead to confusion and repetition. Thus, the court will set out the contentions made in each motion and the opposition thereto and will then discuss the pertinent arguments.

The language of 31 U.S.C. § 5321(a)(2) provides, as follows:

The Secretary of the Treasury may impose an additional civil penalty on a person not filing a Report, or filing a Report containing a material omission or misstatement, under Section 5316 of this Title or a regulation prescribed under Section 5316. A civil penalty under this paragraph may not be more than the amount of the monetary instrument for which the Report was required. A civil

penalty under this paragraph is reduced by an amount forfeited under Section 5317(b) of this Title.

31 U.S.C. § 5321(a)(2). In its summary judgment motion, the Government claims that the undisputed facts of this case entitle it to recovery under this provision and, therefore, to judgment against Hall. *See* document 10 of record.

The Government points to two undisputed facts as support for this claim. First, that Hall did transport $1,035,000 in bearer United States Treasury Notes with coupons attached and bearer Municipal Bonds with coupons attached from Cumberland County, Pennsylvania to Nassau, Bahamas without filing a currency and Monetary Instrument Report (CMIR) as required by 31 U.S.C. § 5316(b), *see* document 11 of record at 2, and secondly, that Hall pled guilty to this offense on December 3, 1984. *See id.* These facts, the Government contends, when coupled with the power to assess a civil penalty upon such offenders given to it by 31 U.S.C. § 5321(a)(2), warrant the granting of summary judgment in its favor. *See generally id.*

In response to the Government's motion and in support of his own motion, Hall essentially makes five arguments. First, Hall argues that this penalty assessment constitutes a violation of representations made by the Government to induce Hall to sign the plea agreement and enter his guilty plea. *See* document 17 of record at 26. Hall's second contention is that the Government's actions in this case violate various constitutional provisions, including the double jeopardy clause[1] and the separation of powers doctrine. *See id.* at 51. Next, Hall contends that the conduct of Queen and Customs Agent Richard T. McCloskey (McCloskey) in this action violated Section 554(d) of the Administrative Procedures Act, 5 U.S.C. § 554(d) and denied him due process of law. *See id.* at 61. Additionally, Hall maintains that the documents at issue in the underlying criminal case were not truly "negotiable" and,

therefore, no civil penalty is warranted. *See id.* at 72. Finally, Hall claims that the doctrines of laches and estoppel bar this action by the Government. *See id.* at 77.

The Government denies that it made any misrepresentations to Hall to induce him to plead guilty, or that this action, or the roles of Queen and McCloskey, violate any provisions of the constitution or federal law. *See generally* document 24 of record. Furthermore, the Government contends that Hall is estopped by virtue of his guilty plea from arguing that these instruments are not truly "negotiable" and that the assessment at issue here is in no way barred by the doctrines of laches or estoppel. *See id.* Hall's reply contends that the Government's responses to his five arguments are without merit. *See* document 26 of record. Because the court finds that Hall is entitled to summary judgment because the imposition of a civil assessment in this particular case violates the terms of the plea agreement and also constitutes a violation of the double jeopardy clause, the court finds it necessary only to address the first two arguments.

A.  *Does the Government's Assessment of This Civil Penalty Violate the Plea Agreement or Other Representations Made to Hall By the Government to Induce His Guilty Plea?*

Hall's basic contention here is that the Government, through Assistant United States Attorney David C. Shipman, (Shipman), represented to him and his counsel that "our office has no other open investigation concerning John P. Hall, and he is not a target of any other investigation in the Middle District of Pennsylvania or in any other Federal District to the best of my knowledge." Document 24 of record, attachment A. Because this representation was made in response to an inquiry from Hall's counsel as to whether Shipman knew of any "problems" Hall could anticipate from any federal agency in relation to his

---

**1.** The Double Jeopardy Clause of the United States Constitution reads:

"[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb ..." U.S. Const.Amend. V.

guilty plea, and because it induced him to sign the plea agreement and plead guilty, Hall argues that his plea was not knowingly and voluntarily given and that the present action should be nullified as violative of the plea agreement. *See* document 17 at 26.

In response to this argument, the government maintains that the language of the plea agreement reveals no express or implied promise regarding civil litigation. *See* document 24 at 5. Moreover, the Government argues, such a promise would surely have been included in the agreement since the parties obviously took great pains to specifically identify the areas in which immunity had been granted. *See id.*

Disposition of charges after plea negotiations is an essential component of the administration of justice. *Santobello v. New York,* 404 U.S. 257, 260, 92 S.Ct. 495, 497, 30 L.Ed.2d 427 (1971). It leads to prompt and largely final disposition of most criminal cases. *Id.* at 261, 92 S.Ct. at 498. Such considerations, however, presuppose fairness in securing the agreement between the accused and the prosecutor. *Id.* Thus, "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Id.* at 262, 92 S.Ct. at 499; *see also United States v. Crusco,* 536 F.2d 21, 26 (3d Cir.1976).

The holding of *Santobello* is no less applicable when a prosecutor makes unfullfillable promises during plea negotiations. *Palermo v. Warden, Green Haven State Prison,* 545 F.2d 286, 296 (2d Cir.1976) *cert. dismissed,* 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977) (promise of parole); *Correale v. United States,* 479 F.2d 944, 947 (1st Cir.1973) (promise that sentence would run concurrently with state sentence). Fundamental fairness and public confidence require that prosecutors "adhere strictly to the terms of a bargain it strikes with defendants." *United States v. Miller,* 565 F.2d 1273, 1274 (3d Cir.1977).

■ Although a plea agreement occurs in a criminal context, it remains contractual in nature and is to be analyzed under contract-law standards. *United States v. Moscahlaidis,* 868 F.2d 1357, 1361 (3d Cir. 1989). Furthermore, disputes over any particular term of a plea agreement must be resolved by objective standards. *United ed States v. Nelson,* 837 F.2d 1519, 1522 (11th Cir.) *rehearing denied* 845 F.2d 1032 (1988); *see also United States v. Read,* 778 F.2d 1437, 1441 (9th Cir.1985) *cert. denied* 479 U.S. 835, 107 S.Ct. 131, 93 L.Ed.2d 75 (1986). A determination of exactly what promises constitute the plea bargain must be based upon the totality of the surrounding circumstances and involves a case-by-case adjudication. *United States v. Grant,* 622 F.2d 308, 312 (8th Cir.1980).

■ Any ambiguities in the terms of the plea agreement will be construed against the Government. *Crusco,* 536 F.2d at 25. Nevertheless, the agreement itself controls where its language sets out the terms of the bargain with specificity. *See United States v. Krasn,* 614 F.2d 1229, 1233 (9th Cir.1980).

■ In the instant case, Hall contends that during plea negotiations between his counsel and Shipman, Shipman was asked to disclose whether Hall had " 'any' 'problems' ... with any Federal Governmental agency" in order that such problems could be addressed in the plea negotiations. *See* document 17 at 26. Shipman himself, in his deposition, admitted that such a request was made by stating:

[Hall's counsel's] concern was, as I recall it, are there any other things out there in addition to this that he is being investigated for or he's going to be prosecuted for. And I said, not to my knowledge.

Document 18, exhibit B (Shipman Deposition at 50). Additionally, Shipman, in a letter dated November 29, 1984, informed Hall's counsel as follows:

As I told you during our meeting on November 29, 1984, our office has no other open investigation concerning John P. Hall, and he is not a target of any other investigation in the Middle District of Pennsylvania or in any other Federal District to the best of my knowledge.

*See* document 24 of record, attachment A.

Considering the totality of the surrounding circumstances, the court concludes that

the representations contained in the November 29, 1984 letter were part of the plea bargain even though they were not contained in the document entitled "Plea Agreement." Such a conclusion is apparently undisputed by the Government and could hardly be disputed since it was Shipman who suggested the "alternative procedure" of a letter exchange whereby the parties could agree to certain matters without placing those matters in the written "Plea Agreement", yet effectively reach the same result. *See* document 18, exhibit G.

Hall alleges that the statements contained in Shipman's letter were misrepresentations, since he knew or could have discovered through a good faith inquiry that McCloskey had already begun an investigation that would ultimately result in the imposition of the civil assessment presently at issue. As support for this allegation, Hall points to McCloskey's deposition testimony in which he states as follows:

> To the best of my knowledge—I recall the conversation. I was in Mr. Shipman's office when evidently he had a communique from [Hall's counsel]. Mr. Shipman asked me if we, the Customs Service, had any other investigations relative to John P. Hall. I explained to Mr. Shipman that to the best of my knowledge, there was no other criminal investigations relative to John P. Hall. I further discussed with Mr. Shipman, I said-I didn't say. I informed him that pursuant to the Title 31 provision, there could be a civil penalty attached to this case.

McCloskey Deposition at 39. Later, McCloskey again states:

> ... [B]y me telling Mr. Shipman that I had no other criminal investigations on John P. Hall, that's exactly what I meant,.... This civil penalty was part and parcel of this criminal investigation, which I wrote up as part of the criminal case and I forwarded it to the appropriate authorities for whatever action they deemed appropriate. I explained to Mr. Shipman during that meeting that there

could be and there may be a civil penalty attached to this case.

McCloskey Deposition at 39–40.

Shipman also admits that, at the time he made the representation at issue to Hall's counsel he was aware of the possibility of a civil penalty, yet deliberately chose not to discuss it. *See* document 18 of record, exhibit B. Specifically, Shipman states as follows:

> ... I did not want to bring up the subject of the possible civil penalty because I didn't know what they were going to do down the line. Frankly, I didn't care what they did down the line. I'm talking about Treasury. I didn't want to see some big issue come up and go through long negotiations when I was not going to be a part of that. And frankly, if [Hall's counsel] would have brought up the subject about, well, what about potential civil penalties by Treasury for this currency violation, then we would have discussed it. Since [he] didn't, I didn't.

*See id.* (Shipman Deposition at pp. 50–51).

In light of this evidence, the court concludes that, on November 29, 1984, when Shipman informed Hall's counsel that "to the best of his knowledge" Hall was "not a target of any other investigation in the Middle District of Pennsylvania or in any other Federal District ...", *see* document 24, attachment A, Shipman was or should have been aware that McCloskey had, as "part and parcel" of the criminal investigation, taken certain investigatory steps necessary to "show a basis for the [civil] penalty" and forwarded that information to "the appropriate authorities for whatever action they deemed appropriate." McCloskey Deposition at pp. 39–40 and 63–64. While the fact that Shipman did not want to bring up the subject because it might lead to long negotiations over which he would have no control does not undermine the objective nature of the contractual inquiry, it does lead the court to conclude that Shipman's statement to Hall's counsel that he knew of no other investigation of Hall which was underway at the time of the plea negotiations was misleading under the circumstances. Furthermore, the court

is satisfied by its examination of the record that Shipman's "no other investigation" statement was "part of the inducement or consideration," *see Crusco*, 536 F.2d at 26, upon which Hall's guilty plea was based.[2]

The Government argues that the areas in which it agreed not to prosecute Hall were specifically itemized in the following portion of the plea agreement:

> The United States Attorney's Office for the Middle District of Pennsylvania agrees that it will not bring any other criminal charges against the Defendant arising out of the Defendant's involvement in these offenses described above between October 15/November 7, 1984, including but not limited to forgery of securities of the United States and uttering or dealing in the same, in violation of 18 U.S.C. Section 471–473, alteration and misuse of the passport, in violation of 18 U.S.C. Section 1543–1544, and additional counts of wire fraud, in violation of 18 U.S.C. Section 1343.

Document 24, attachment A at p. 3. Additionally, with respect to Shipman's "no other investigation" statement, the Government contends that because Shipman stated only that Hall was no longer a "target" of any investigation, and because "target" is a "well known term of art identifying an individual as a suspect in a criminal investigation," Hall's counsel should have understood that Shipman was representing only that no further *criminal* investigations of Hall were underway. *See id* at 7.

Initially, the court finds the Government's reading of the language of the plea agreement to be challengeable. Although certain areas in which the Government agreed not to prosecute Hall are enumerated in the above paragraph, that enumeration is preceded by the phrase "including but not limited to...." *Id.* This phrase, especially in light of the previous discussions and the November 29th letter, clearly indicates that the above-quoted language

was not intended to be an exhaustive list of the areas in which the Government promised that Hall would not be charged.

Similarly, the Government's interpretation of the term "target" is too narrow to be accepted by the court. Such a "strict and narrow" reading of the Government's commitment under a plea agreement is "untenable." *Crusco*, 536 F.2d at 26. A plea bargain is not an appropriate context for the government to resort to a rigid, literal approach in construction of the agreement's language. *Moscahlaidis*, 868 F.2d at 1357; *See also Crusco*, 536 F.2d at 26; *In re Arnett*, 804 F.2d 1200, 1203 (11th Cir.1986); *United States v. Bowler*, 585 F.2d 851, 854 (7th Cir.1978).

Thus, the court is persuaded that Shipman made a statement to Hall's counsel during plea negotiations that could reasonably be understood as an assurance that, at that time, no investigation of Hall was underway that would lead to a civil penalty such as the one at issue in this case. Mindful of the discussions leading up to acceptance and execution of the document entitled "Plea Agreement", as evidenced by Shipman's November 29, 1989 letter, the language "other criminal charges" contained therein should objectively be construed as including a further penalty assessment by the Treasury Department. In addition, it is clear that the statement contained in Shipman's letter was part of the inducement or consideration upon which Hall's guilty plea was based. Because the conditions for a valid plea presuppose fairness in securing the agreement, *Mabry v. Johnson* 467 U.S. 504, 509, 104 S.Ct. 2543, 2547, 81 L.Ed.2d 437 (1984) such a representation is clearly sufficient to establish that Hall's guilty plea was not knowing and voluntary and to constitute a breach of the plea agreement.

Having convinced the court that Hall's plea was based in part upon the Govern-

---

**2.** This is evidenced by the fact that Hall, upon being provided with this assurance, immediately accepted the terms of the plea agreement, provided statements to law enforcement officials the next day, and entered his guilty plea within a week. *See* document 17 of record, at 17 n. 7.

Even Shipman testified that he wrote the November 29, 1984 letter "to try to give [Hall] the type of assurance he was looking for." *See* document 18 of record, exhibit B (Shipman Deposition at pp. 37–38).

ment's representation does not, however, automatically entitle Hall to summary judgment in his favor in this action. While the court has determined that the Government has breached the plea agreement, the court must move to the next step which is to determine in its discretion whether such a breach can best be remedied by "conform[ing] the sentence to the provisions of the plea bargain or allow[ing] withdrawal of the guilty plea." *Moscahlaidis,* 868 F.2d at 1357 and *United States v. American Bag and Paper Corp.,* 609 F.2d 1066, 1068 (3d Cir.1979).

Hall contends that the court should specifically enforce the plea agreement by holding that the Government cannot maintain this action and granting summary judgment in his favor. In support of his position that the court may require specific performance in this case, Hall points to *Arnett,* 804 F.2d 1200 and *United States v. Runck,* 601 F.2d 968 (8th Cir.1979).

In *Arnett,* the United States Court of Appeals for the Eleventh Circuit held that the Government breached the terms of a plea agreement by bringing a forfeiture action against Arnett's farm after representing to Arnett during plea negotiations that no forfeiture would take place beyond that of the $3,000 found on his person at the time of his arrest. *Arnett* 804 F.2d 1201–1204. As a remedy for this breach, the court required the Government to withdraw the forfeiture action against Arnett's farm. *See id.* at 1204.

Similarly, the United States Court of Appeals for the Eighth Circuit, in *Runck,* concluded that the condition of restitution of a large sum of money which was imposed by the district court at sentencing, but was not mentioned in the plea agreement, "created a material change in the plea bargain." *Runck* 601 F.2d at 970. As a remedy for this, the *Runck* court required that the defendant be resentenced in accordance with the plea agreement and without the imposition of the condition of restitution. *See id.*

In opposing the imposition of specific performance, the Government argues that Hall has not established that (a) the United States promised not to bring a civil proceeding against him; (b) there was any civil proceeding against him at the time he entered into the guilty plea; or (c) that the Government had a duty to advise him that there were potential civil consequences to his plea of guilty to the criminal offense. *See* document 24 of record at 15. The present civil penalty action, the Government's argument continues, is merely a "collateral consequence" of Hall's guilty plea and, therefore, the Government had no duty to inform Hall of the possibility of this consequence. *See id.*

The court does not agree with the Government's argument. While this civil penalty action is correctly characterized as a collateral consequence of Hall's guilty plea, the fact remains that Shipman, the Government's representative in the plea negotiations, stated to Hall's counsel that he had no knowledge of any federal investigation of Hall which was in progress at that time, despite the fact that he was, or should have been, aware that the investigation which would ultimately result in the present action was underway. Inasmuch as this statement could reasonably be understood by Hall as an assurance that no action such as the present one would be brought against him, and because it was part of the inducement for Hall's guilty plea, the court finds that to allow the Government to maintain this action would, in effect, deprive Hall of the basic fairness required by law in securing the conditions of a plea agreement. *See Mabry,* 467 U.S. at 509, 104 S.Ct. at 2547. Accordingly, the court concludes that the Government's violation of the plea agreement can best be cured by granting summary judgment in favor of Hall and against the Government and dismissing this action.

Even if the court were not to grant Hall summary judgment due to the Government's breach of the plea agreement, the Government's attempt to assess this civil penalty could still be challenged as violative of the double jeopardy clause. Thus, the court finds it necessary to put forth a brief discussion of the parties' arguments on that point.

B. *Does the Government's Assessment of This Civil Penalty Violate the Double Jeopardy Clause?*

■ The double jeopardy clause of the fifth amendment protects against three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). The third of these protections, is the one which Hall claims the Government has violated by bringing this action for imposition of a civil penalty.

Basically, Hall argues that the imposition of this penalty, although done pursuant to a "civil" procedure, is in reality a further punishment for the criminal conduct to which he pled guilty. *See* document 17 of record at pp. 51–60. In making this argument, Hall relies on the recent decision of the United States Supreme Court in *United States v. Halper,* — U.S. —, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989).

In *Halper,* the Court considered the question of "whether and under what circumstances a civil penalty may constitute punishment for purposes of the Double Jeopardy Clause." *Id.* 109 S.Ct. at 1901. A unanimous court held that "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can be explained only as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." *Id.* at 1902. The double jeopardy clause, the court went on to hold, prohibits the imposition of such a civil sanction "to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." *Id.* It is implicated when "... the sanction [is] overwhelmingly disproportionate to the damages [defendant] has caused." *Id.*

In determining the purpose behind a civil sanction, the court must look at more than just the language of the statute itself. As the *Halper* court stated:

... [W]hile recourse to statutory language, structure and intent is appropriate in identifying the inherent nature of a proceeding, or in determining the constitutional safeguards that must accompany those proceedings as a general matter, the approach is not well suited to the context of the 'humane interests' safeguarded by the Double Jeopardy Clause's proscription of multiple punishments. This constitutional protection is intrinsically personal. Its violation can be identified only by assessing the character of the actual sanctions imposed on the individual by the machinery of the state.

*Id.* at 1901 (citation omitted). Thus, the labels of "civil" and "criminal" are not of paramount importance in making this determination. *See id.* A civil sanction constitutes punishment when the sanction as applied in the individual case serves the goal of punishment. *Id.* at 1901–1902.

With respect to the present civil penalty, the Government argues that 31 U.S.C. § 5321(a)(2) compares favorably with the monetary penalty provisions of 19 U.S.C. § 1592 and its predecessors (involving importation of items into the United States by fraud) because the two sections share the same "broadly remedial" purpose. *See* document 24 of record at p. 22 (citing *United States v. Alcatex,* 328 F.Supp. 129, 132–133 (S.D.N.Y.1971). Specifically, the Government contends that it has suffered immeasurable damages as a result of Hall's misconduct, including the "heavy burden" of investigation and prosecution, the "vast sums expended to monitor the borders of the United States and to maintain liaison with other countries in order to discover such criminal conduct," and "the injuries sustained by the United States' trade and economic programs." *See* document 24 of record at p. 23. The penalty provision of 31 U.S.C. § 5321(a)(2), the Government contends, was designed to redress these damages and make the Government whole. *See id.*

Hall maintains that the Government has suffered no real losses in this action and has imposed this civil penalty only because it was dissatisfied with the sentence imposed upon Hall by this court. *See* document 26 of record at p. 38. As support

for this contention, Hall points out that all missing documents were turned over to the Government by the defendant on the day of his arrest, that McCloskey's investigation admittedly was of a very short duration and was made easy by a phone call from a Bahamian stockbroker to Hall's father, and that Shipman himself testified that "[T]here was no real loss." *See* document 18, exhibit B (Shipman deposition at 69).

In *Halper*, the Court restated its time-honored recognition of the fact "that in the ordinary case fixed-penalty-plus-double-damages provisions can be said to do no more than make the Government whole." *Halper*, 109 S.Ct. at 1902. The only proscription established by the Court in *Halper* is that "the Government may not criminally prosecute a defendant, impose a criminal penalty upon him, and then bring a separate civil action based on the same conduct and receive a judgment that is not rationally related to the goal of making the Government whole." *Id.* at 1903. It is this second proceeding that triggers the protections of the Double Jeopardy Clause. *See id.,* n. 10.

In the present case, the Government puts forth only the most minimal effort at establishing a rational relationship between the $1,035,000 civil penalty and the goal of making the Government whole. Beyond its general assertions concerning the "heavy burden" of investigation and prosecution and the injury to the United States' trade and economic programs, which it characterizes as "impossible to measure, with precise certainty," the Government makes no attempt to quantify the actual losses it has suffered as a result of Hall's criminal misconduct. The absence of such a quantification, when coupled with the disproportionate relationship between the amount of the fine and the damages apparently caused by Hall's conduct, leads the court to conclude that this fine is not rationally related to the goal of making the Government whole.

Although, as the Government points out, statutes such as 31 U.S.C. § 5321(a)(2) do no more than provide "a reasonable form of liquidated damages for violation [of the law]" and serve "to reimburse the Government for investigatory and enforcement expenses," *One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 237, 93 S.Ct. 489, 493, 34 L.Ed.2d 438. (1972), the court does not believe, especially in light of *Halper*, that such statutes give the Government a free hand to impose civil penalties without regard to the costs incurred and damages suffered as a result of criminal conduct. The issue is not whether the Government is prohibited by the double jeopardy clause from imposing fines under such statutes, but, instead, "... what the Constitution commands when one of those imprecise formulas authorizes a supposedly remedial sanction that does not remotely approximate the Government's damages and actual costs, and rough justice becomes clear injustice." *Halper*, 109 S.Ct. at 1901.

In the instant case, if the court were to allow the Government to impose this fine, without at least requiring some approximation of its actual damages and costs, the court would be sanctioning the very type of "clear injustice" which *Halper* prohibits. Thus, based upon the prohibition of Halper, the court concludes that the civil penalty assessed by the Government in this case, in its present form, violates the double jeopardy clause by twice punishing Hall for the same criminal conduct.

Summary judgment in Hall's favor, however, would not necessarily be the remedy required by this holding. Instead, this court, like the Court in *Halper*, believes it would be "unfair to deprive the Government of an opportunity to present ... an accounting of its actual costs arising from [Hall's criminal conduct] ..., and to recover its demonstrated costs." *Halper*, 109 S.Ct. at 1903–1904. Accordingly, even if Hall were not entitled to summary judgment based upon the Government's violation of the plea agreement, the best result the Government could expect from this court would be that both motions would be held in abeyance pending the submission by the Government of an approximation of the costs incurred and the damages suffered as a result of Hall's criminal conduct.

### III. Conclusion

The court finds that the Government's attempt to impose the civil penalty at issue in this action is violative of the conditions of a plea agreement entered into by the parties, and summary judgment will be granted in favor of Hall and against the Government. An appropriate Order will enter.